**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| TODD A. HELLER,<br><br>               Plaintiff,<br><br>     v.<br><br>GREENSTAR, LLC,<br><br>   and<br><br>WASTE MANAGEMENT, INC.,<br><br>              Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Todd A. Heller ("Heller" or "Todd") brings this Complaint against Greenstar, LLC ("Greenstar") and Waste Management, Inc. ("Waste Management") for breach of contract, fraud, negligent misrepresentation, and negligence. In support thereof, Heller alleges as follows:

## INTRODUCTION

Waste Management, Inc., a multi-billion-dollar corporation, and its wholly-owned subsidiary, Greenstar, LLC, contaminated Todd Heller's property, abandoned their contractual obligations, and then lied about insurance coverage to avoid paying for the damage they caused. Todd, an individual property owner, was left with no choice but to seek judicial intervention to hold this billion-dollar corporation accountable for millions of dollars in damages that it inflicted on Todd.

The facts are straightforward. In 2007, Heller sold his recycling business to Greenstar and leased his 38-acre property in Northampton, Pennsylvania to Greenstar for its operations. The Lease required Greenstar to clean and remove all materials from the property, including buried glass and contaminated fill prior to exiting the property. Greenstar never complied. When Waste

Management acquired Greenstar in 2013, Waste Management assumed control of Greenstar's operations and dealt directly with Heller on all lease matters. Yet when the Lease expired on February 28, 2026, Greenstar walked away, leaving behind thousands of cubic yards of buried glass, arsenic-contaminated fill material, recyclables, trash, and an unpermitted subtenant still occupying the property. Waste Management believes that because of the power dynamics between these two parties, it can act without regard for the economic and environmental impact of their flippant behavior.

Waste Management's misconduct extends beyond abandonment. In July 2013, Waste Management sent Heller a letter confirming it had obtained $8,214,254 in all-risk property insurance covering the Property, with Heller named as loss payee. Relying on this representation, Heller cancelled his own insurance policy. Then, on February 4, 2025, a fire destroyed two buildings on the Property—approximately 51,768 square feet. Heller immediately notified Waste Management. Instead of submitting an insurance claim, Waste Management denied any coverage existed. Waste Management's Assistant General Counsel stated in writing that "at the time of the incident in question it appears WM was not providing property coverage." This was false. After nearly a year of stonewalling, Heller discovered that Waste Management had continuously insured the Property from 2013 through at least March 2026 in the exact amount Waste Management originally represented. Waste Management's fraud prevented Heller from filing a timely insurance claim and cost him the opportunity to rebuild the Property and lease it to a prospective tenant who had offered $100,000 per month in rental income.

Heller brings this action to recover compensatory and punitive damages for Defendants' breach of contract, fraud, negligent misrepresentation, and negligence.

**PARTIES**

1.      Plaintiff Todd A. Heller is an adult individual domiciled in Lehigh County, Pennsylvania with an address of 2172 New Street, Orefield, Pennsylvania.

2.      Heller owns a parcel of real property located at 799 Smith Lane, Northampton, Pennsylvania, 18067 (the "Property"), which consists of approximately thirty-eight (38) acres and improvements, including two buildings with gross building area of 51,768 square feet (a processor building and a baler building) as well as a glass plant, a bead plant, metal warehouses, and an office.

3.      Prior to September 4, 2007, Heller owned all issued and outstanding shares of capital stock of Todd Heller, Inc., a corporation engaged in the business of transferring, converting, collecting, washing, processing, baling, separating, crushing, densifying, otherwise processing, trading, brokering and commercially buying and selling recyclables, including, without limitation, paper, plastic, glass, metals and residue (the "Business").

4.      Defendant Greenstar, LLC is a limited liability company organized under the laws of Delaware with a business address of 3411 Richmond Ave, Suite 700, Houston, Texas, 77046.

5.      Upon information and belief, the sole member of Greenstar, LLC is WM Recycle America, LLC.

6.      Upon information and belief, the sole member of WM Recycle America, LLC is Waste Management, Inc.

7.      Defendant Waste Management, Inc. is a Delaware corporation with its principal place of business at 800 Capitol Street, Suite 3000, Houston, Texas.

8.      Waste Management is the largest solid waste hauling and disposal company in the United States and provides waste collection, recycling, and disposal services.

9. In or around January 2013, the sole member of Greenstar was Greenstar North America Holdings, Inc., which was a Delaware corporation with its principal place of business in Houston, Texas.

10. On January 31, 2013, Waste Management's subsidiary, WM Recycle America, LLC, acquired the stock of Greenstar from Greenstar North America Holdings, Inc.

11. At that time, Waste Management, through its wholly-owned subsidiary, stepped into the shoes of Greenstar, inheriting all prior activity of Greenstar since inception.

12. From January 31, 2013 onward, Heller communicated directly with Waste Management, not WM Recycle America, LLC, regarding his relationship with Greenstar.

## JURISDICTION AND VENUE

13. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Heller is a citizen of Pennsylvania while Greenstar and Waste Management are citizens of Delaware and Texas, and the amount in controversy in this matter is greater than $75,000, exclusive of costs and interest.

14. This Court may exercise personal jurisdiction over Greenstar because Greenstar transacts business, maintains substantial contacts, or committed overt acts in furtherance of its misconduct in Pennsylvania, including in this District.

15. Greenstar's conduct has been directed at, and has had the intended effect of causing injury to, an individual residing in, located in, or doing business in Pennsylvania.

16. Further, this case arises from and relates to Greenstar's direct and purposeful contacts and agreements with Heller, a Pennsylvania resident.

17.    This Court may exercise personal jurisdiction over Waste Management because Waste Management transacts business, maintains substantial contacts, or committed overt acts in furtherance of its misconduct in Pennsylvania, including in this District.

18.    Waste Management's conduct has been directed at, and has had the intended effect of causing injury to, an individual residing in, located in, or doing business in Pennsylvania.

19.    Further, this case arises from and relates to Waste Management's direct and purposeful contacts and communications with Heller, a Pennsylvania resident.

20.    Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) and (c)(2) because a substantial part of the events giving rise to the claims occurred in this District, because the property that is the subject of the action is in this District, and because Greenstar and Waste Management are both subject to personal jurisdiction in this District.

## **FACTS**

21.    In the 1990s, Heller, through Todd Heller, Inc., owned and operated the Business at the Property.

22.    As part of the Business, Heller processed and recycled glass at the Property.

23.    In September 2007, Greenstar contracted to purchase the Business from Heller, as the sole owner of all issued and outstanding shares of capital stock of Todd Heller, Inc., for $58.75 million pursuant to an Asset Purchase Agreement (the "APA").

24.    Under the APA, Greenstar Allentown, LLC f/k/a Penn Acquisition Sub, LLC purchased certain of the Todd Heller, Inc.'s assets.

25.    Greenstar Allentown, LLC is a Delaware limited liability company.

26.    Defendant Greenstar is the sole member of Greenstar Allentown, LLC.

27.    For purposes of this Complaint, Defendant Greenstar and Greenstar Allentown, LLC will be individually and collectively referred to as "Greenstar."

28.    At the time Greenstar acquired the Business in 2007, the Property was in good condition with no recognized environmental conditions.

29.    A Phase I Environmental Site Assessment conducted by The Cardinal Group, Inc. in January 2007 specifically concluded that the Property "revealed no evidence of recognized environmental conditions." Any environmental contamination present on the Property today was caused by Greenstar's and its sublessee's operations, as described below.

30.    The assets acquired by Greenstar under the APA included all equipment, fixtures, motor vehicles, trailers, rolling stock, machinery, apparatus, tools, implements, spare parts, and other items of tangible personal property owned by Todd Heller, Inc., all accounts receivable of Todd Heller, Inc., all office supplies, spare parts, safety equipment, maintenance supplies, and other supplies used or consumed in the Business, all administrative systems, equipment, and facilities, all current books and records, all licenses, permits, applications, registrations, notices of intent, franchises, consents, waivers, variances, authorizations, and other approvals used in connection or necessary with respect to the Business, all of Todd Heller, Inc.'s interests and rights in certain contracts listed in Schedule 1.1(g) of the APA, prepaid items, intellectual property, warranties, name, intangibles, cash, and other assets.

31.    The purchase price was $58.75 million.

32.    After the APA closed, Todd Heller, Inc. retained certain Excluded Assets, including, among other things, Todd Heller, Inc.'s inventory and excluded equipment.

33.    The APA defined inventory as, without limitation, all recyclable materials owned by Todd Heller, Inc. as of the closing date of the APA.

34.     The APA defined excluded equipment as, without limitation, equipment affixed to the building in which it is located, fixtures, machinery, including, without limitation, machinery affixed to the building in or next to which it is located, apparatus, tools, implements, spare parts, and other items of tangible personal property owned by Todd Heller, Inc.

35.     In a separate Inventory Supply and Purchase, Equipment Lease and Purchase and Marketing Agreement (the "Inventory Contract"), Greenstar purchased all of Todd Heller, Inc's inventory.

36.     Todd Heller, Inc. retained no business assets after the execution of the Inventory Contract, which occurred on or around September 14, 2007.

37.     At that time, all assets of Todd Heller, Inc., including all inventory of Todd Heller, Inc., became the sole property of Greenstar.

38.     This inventory included all glass materials on the Property because, among other things, the definition of "Inventory" under the APA and Inventory Contract included "all recyclable materials owned by" Todd Heller, Inc. as of the closing date.

39.     Greenstar did not purchase the Property itself or the improvements thereon.

40.     At all relevant times hereto, the Property and all improvements thereon were owned separately by Heller in his individual capacity.

Greenstar's Business on the Property

41.     After the APA's closing, Greenstar operated its business on the Property.

42.     Upon information and belief, Greenstar was in the recycling business and generally conducted three types of recycling businesses on the Property: (1) material recovery facility, which sorts single stream materials and processes them into their constituent grades; (2) a bead manufacturing plant, which grinds certain quality glass in furnaces to make reflective glass beads

for road projects; and (3) a glass sorting facility (the "glass plant"), which processes color separated and mixed broken glass (and certain contaminants contained in that glass) into a material called glass cullet.

43.     Greenstar operated the glass sorting facility from September 2007 through approximately July or November 2011, at which time it sold the glass plant business to CAP Glass Allentown, LLC.

44.     Glass recycling facilities process an endless flow of glass materials using a variety of different processing operations, including crushing and separation and removal processes.

45.     The crushing process reduces the glass to various sized material depending on the next processing step or the end market. This material litters the floor and soil.

46.     After Greenstar sold the glass plant business to CAP Glass Allentown, LLC, the mixed recyclable material continued to be processed through the commingled building on the Property and mixed broken glass ("MBG") was then provided to CAP Glass Allentown, LLC for further processing.

47.     The glass materials discarded through the various operational processes resulted in waste materials that required cleanup and removal from the recycling plant flooring and soils.

48.     Greenstar continued to process mixed recyclables on the Property after selling the glass business to CAP Glass Allentown, LLC.

49.     After its acquisition of Greenstar in or around January 2013, Waste Management used the Property as a hub for waste management, until February 28, 2026.

50.     CAP Glass Allentown, LLC, pursuant to a sublease described in more detail below, used certain portions of the Property to process large volumes of glass.

The Lease

51.     On August 30, 2007, Heller and Greenstar, LLC entered into a Lease Agreement (the "Lease"), by which Heller, as Landlord, leased to Greenstar, as Tenant, the Property and all improvements thereon, including, without limitation, the glass plant, the bead plant, the commingled building, the metal warehouse, and the office. **Exhibit A**, the Lease, Section 1.1 (Demising of Premises).

52.     The lease had a fifteen-year term, commencing on the closing date of the Asset Purchase Agreement, or on or around July 31, 2007. *Id.*, Section 2.2 (Commencement Date).

53.     The Lease expired on or around July 31, 2022.

54.     Annual rent for the first lease year was twenty-four thousand dollars triple net ($24,000), payable in equal monthly installments of $2,000. *Id.*, Section 3.1 (Annual Rent).

55.     After the first lease year, annual rent increased to four hundred fifty thousand dollars triple net ($450,000) payable in monthly installments of $37,500. *Id.*, Section 3.1 (Annual Rent).

56.     The annual rent automatically increased each new lease year after the second lease year by three percent (3%) annually. *Id.*, Section 3.1 (Annual Rent).

57.     Article 7.1 of the Lease set forth the Tenant's covenants.

58.     Those covenants included, among other things, an agreement by Tenant, upon the expiration or termination of the Lease, to "remove its goods and effects and those of all persons claiming under it and to yield up peaceably to Landlord the [Property] in as good condition as when received, excepting deterioration caused by ordinary wear and tear, casualty, and condemnation." *Id.*, Section 7.1 (Tenant's Covenants).

59.     Section 8.1 of the Lease set forth Tenant's indemnification and public liability obligations. *Id.*, Section 8.1 (Indemnity and Public Liability).

60.     Under Section 8.1 of the Lease, Greenstar, as Tenant, was required to maintain at its sole cost and expense public liability insurance with limits of not less than $1,000,000 for injury or death and $5,000,000 in the aggregate, insuring Landlord (Heller) and Tenant (Greenstar) against injury to persons or damage to the Property, with Landlord (Heller) named as an additional insured. *Id.*, Section 8.1 (Indemnity and Public Liability).

61.     Section 13.1 of the Lease set forth Landlord's all risk insurance obligations. *Id.*, Section 13.1 (All Risk Insurance)

62.     Under Section 13.1 of the Lease, Landlord (Heller) was required to maintain all-risk insurance (including rent insurance) on all buildings and improvement. *Id.*, Section 13.1 (All Risk Insurance)

63.     During the initial term of the Lease, and any extension thereof, the Tenant (Greenstar) was required to reimburse Landlord (Heller), as additional rent, the cost of such insurance coverage. *Id.*, Section 13.1 (All Risk Insurance)

64.     Pursuant to Section 13.1, Heller maintained all-risk insurance and submitted the invoices he received from the insurance carrier to Greenstar for payment through July 30, 2013, at which time Waste Management, whose subsidiary had acquired the stock of Greenstar, represented to Heller that it would obtain all-risk insurance for the Property.

65.     Greenstar paid the insurance carrier directly on an installment basis.

66.     Section 16.4 of the Lease set forth the Landlord's remedies in the event of a holdover tenancy. *Id.*, Section 16.4 (Holding Over)

67.     Section 16.4 provided as follows: "In the event that Tenant or anyone claiming under Tenant shall continue occupancy of [the Property] after the expiration of the term of his Lease without any agreement in writing between Landlord and Tenant with respect thereto, such occupancy shall not be deemed to extend or renew the term of this Lease, but such occupancy shall continue as a tenancy at will from month to month upon the covenants, provisions and conditions herein contained." *Id.*, Section 16.4 (Holding Over)

68.     Under Section 16.4, the Annual Rent in effect during the holdover period shall equal 150% of the Annual Rent payable immediately prior to the expiration of the then-current term, but shall be payable monthly. *Id.*, Section 16.4 (Holding Over)

69.     Under Section 16.15 of the Lease, in the event Tenant failed to pay any amount due under the lease, then interest "shall accrue on such overdue amount from and after the fifteenth (15th) day such amount has not been paid" at a rate of one and one-half percent (1½%). *Id.*, Section 16.15 (Late Charges and Interest)

70.     The Lease is governed by Pennsylvania law. *Id.*, Section 16.7 (Applicable Law)

Greenstar Subleases Part of the Property to CAP Glass

71.     On November 8, 2011, Greenstar entered into a sublease (the "Sublease") with CAP Glass Allentown, LLC, whereby Greenstar, a wholly owned subsidiary of WM Recycle America, LLC, as Sublessor, leased to CAP Glass Allentown, LLC, as Sublessee, for a term of five (5) years, a certain portion of the land located on the Property.

72.     On January 1, 2016, Greenstar and Sublessor extended the Sublease for a term equal to the number of months remaining under the Lease between Greenstar and Heller, less one (1) day.

73.     This meant the Sublease expired on or around July 30, 2022.

74. Greenstar, as Sublessor, subsequently extended the Sublease to allow CAP Glass Allentown, LLC to remain on the Property through February 28, 2026, consistent with the Extended Term of the Lease between Greenstar and Heller.

75. The second extension to the Sublease expired on or around February 28, 2026.

76. Of note, the Sublease between Greenstar and CAP Glass Allentown, LLC did not release Greenstar from any liability under the Lease.

77. To the contrary, Section 10.1 of the Lease states that any subleasing by Tenant shall not release Tenant from any liability under the Lease. **Exhibit A**, Section 10.1 (Assignment and Subletting).

First Amendment to Lease

78. On June 9, 2022, Heller and Greenstar executed the First Amendment to Lease, which amended the Lease with respect to its Term, Rent, and Premises.

79. Pursuant to the First Amendment, Greenstar, as Tenant, leased from Heller, as Landlord, the Property and all improvements thereon, including without limitation the Main Leased Premises, the Office Building, and Area A as designated in Exhibit A of the First Amendment. **Exhibit B**, First Amendment to Lease, Article 1.1 (Demising of Premises).

80. The First Amendment to Lease contained Exhibit A, titled "Description of Demised Premises," which depicts an aerial view of the entire Property.

81. Heller and Greenstar extended the Term of the Lease for three (3) years, commencing August 1, 2022, and ending July 31, 2025 (the "Renewal Term"). *Id.*, Article 2.1 (Term of Lease).

82. Heller and Greenstar agreed that the annual rent during the Renewal Term would be $722,756, payable in monthly installments of $60,230. *Id.*, Article 3.1 (Annual Rent).

83.     All other terms and conditions of the Lease continued in full force and effect.

Insurance on the Property

84.     On January 31, 2013, Waste Management's subsidiary, WM Recycle America, LLC, acquired the stock of Greenstar, LLC.

85.     At that point, Waste Management became the successor of Greenstar.

86.     Prior to Waste Management's acquisition of Greenstar in January 2013, Heller maintained all-risk insurance pursuant to Article 13 of the Lease and submitted invoices from the insurance carrier to Greenstar for payment.

87.     On July 30, 2013, James Campbell Kean, Senior Legal Counsel in Waste Management's Law Department, sent Heller a letter via delivery stating: "I am writing to confirm prior email correspondence I have had with your counsel, Dolores Laputka. To summarize, I have notified Ms. Laputka that when WM Recycle America, LLC purchased the stock of Greenstar, LLC on January 31, 2013, a duplicate of the insurance required under the lease was provided through the WM insurance department."

88.     With that letter, Waste Management included two Certificates of Insurance and stated: "This is to confirm that the previously existing insurance provided Greenstar will be canceled. At no time has Greenstar (before or after the acquisition by WM Recycle America, LLC) failed to provide full coverage as required by the lease agreement. The enclosed certificates comply with the lease agreement requirements and fully cover all obligations."

89.     The first Certificate of Insurance covered general liability, automobile liability, and worker's compensation and employer's liability.

90.     This Certificate of Insurance was consistent with the Tenant's obligations under Article 8 of the Lease.

91.     Waste Management Holdings, Inc. and all affiliated and related and subsidiary companies, including Greenstar Allentown, LLC, were listed as the insured.

92.     Todd Heller was listed as a Certificate Holder in the first Certificate of Insurance.

93.     The second Certificate of Insurance included with Waste Management's July 30, 2013 letter was from Factory Mutual and covered all risk property damage in the amount of $8,214,254.

94.     The property identified on the second Certificate of Insurance was the real property located at 799 Smith Lane, Northampton, Pennsylvania.

95.     The effective certificate term was February 1, 2013 (the day after Waste Management's subsidiary acquired Greenstar) through January 1, 2014.

96.     The effective date of the policy, however, was January 1, 2012.

97.     The policy thus existed prior to WM Recycle America, LLC's acquisition of Greenstar's stock, and Waste Management specifically added the Property to an existing real property insurance policy. This demonstrates that Waste Management intended to carry all-risk insurance on the Property, not simply the liability insurance required under Article 8 of the Lease.

98.     The named insured on this policy was Waste Management, Inc.

99.     Todd Heller was listed as a Loss Payee in the second Certificate of Insurance.

100.    Relying on the representations of Waste Management in its July 2013 letter, including the Certificates of Insurance included therein, Heller cancelled the insurance he maintained on the Property in accordance with Section 13.1 of the Lease.

101.    Consistent with this cancelation, on or around July 27, 2013, Selective Insurance Co. of America, the insurer covering the Property prior to the acquisition of Greenstar by WM Recycle America, LLC, issued a cancelation notice to Greenstar.

102.    The effective date of this cancelation notice was August 14, 2013.

103.    On or around August 24, 2013, Hub International, an insurance broker, also sent a letter to Greenstar confirming this cancelation.

104.    Thereafter, Hub International spoke with Leah Shoemaker, an agent of Greenstar.

105.    Leah Shoemaker informed Hub International that Waste Management had taken over the insurance on the Property.

106.    From that point forward, Heller did not submit any invoices for insurance to Greenstar, as had been done in the past.

Fire at the Property

107.    On February 4, 2025, a multi-day fire engulfed two buildings located on the Property, resulting in significant damage and related costs and expenses. The fire damaged the processor building (approximately 47,000 square feet) and the baler building (approximately 4,768 square feet).

108.    The fire damaged the main processing facility for mixed recyclables, as well as the adjacent building used to bale cardboard, paper, metals, and plastic material from the processing building.

109.    Waste Management maintained a fire suppression system in the main processing system, but it did not cover the entire square foot of the building or reach the back of the building where the fire originated.

110.    Engineering Specialists, Inc. ("ESI") performed a cause and origin investigation and determined that the fire started in Optical Sorter #21, which was located within the southeast side midsection of the Processing Building aligned with Pillar 8 on the west elevation foundation wall. ESI opined that the fire ignited combustible materials directly below the optical sorter,

resulting in an inferno that engulfed the entirety of the Property with an approximate fire duration of thirty-one (31) hours.

111. The intense heat and duration of the fire caused extensive structural damage resulting in a total loss of Heller's buildings.

112. The fire caused Greenstar to shut down its processing operations on the Property and use it as a transfer site for recyclables. In August 2025, Waste Management of Pennsylvania, Inc. entered into a Memorandum of Understanding with Heller concerning the partial demolition of the fire-damaged buildings, wherein Waste Management and its contractor agreed to indemnify and hold harmless Heller from all liability and claims arising from the demolition operations.

113. As part of the partial demolition process, the roof, platforms, and equipment were removed, leaving only the concrete walls of the mixed recycling building. The concrete walls were in the fire for thirty (30) hours and sustained structural damage, necessitating their demolition.

114. The Memorandum of Understanding provided that both Heller and Waste Management of Pennsylvania, Inc. had the right to photograph and videotape the demolition work and to recover and preserve potential evidence as they or their representatives deem necessary throughout the course of the demolition project.

115. Waste Management of Pennsylvania, Inc. violated this provision by allowing concrete blocks that were located across from the entrance of the mixed recycling building to be moved so a truck could be retrieved and removed from inside the building.

116. This was done without prior notice to Heller, prohibiting him from being present to photograph, videotape, or preserve the evidence associated with this conduct.

117. Heller questioned Jim VanWoert of Waste Management about these issues.

118. Jim Van Woert is the Area Director of Disposal Operations, Greater Mid-Atlantic Market Area at Waste Management.

119. On July 26, 2025, Jim VanWoert acknowledged via email that "[t]he company that purchased [the truck] dispatched a crew to pick it up without informing my management or fleet teams" and expressed that Waste Management's "fleet manager reached out to them to express our displeasure with them entering the structure without our approval."

120. Waste Management, however, was responsible for securing the building in accordance with the Memorandum of Understanding.

121. By allowing a company to dispatch a crew, enter the property, and remove a truck, Waste Management of Pennsylvania, Inc. failed to secure the building.

122. Worse, Waste Management of Pennsylvania, Inc. never informed Heller about the truck removal. Rather, Heller discovered this incident on his own.

123. The subleased property and glass processing operations of CAP Glass Allentown, LLC were unaffected by the fire, and CAP Glass Allentown, LLC continued to operate.

124. Heller owned the buildings on the Property in his individual capacity.

125. Heller placed Waste Management on notice of the claim almost immediately after the date of the incident.

126. Despite repeated requests from Heller for copies of the applicable insurance policies, Waste Management stated that no insurance was in place and denied Heller access to information surrounding possible coverage.

127. For example, on February 11, 2025, VanWoert sent an e-mail to Thomas Malone ("Malone"), CPA, the Managing Partner at Aureus Family Office, LLC, and Heller's agent and

advisor, attaching the declaration pages for the Waste Management insurance policy associated with the Property.

128.    The declaration pages did not provide any information regarding all-risk insurance coverage for the Property during the loss period, so Heller had no details regarding coverage for the Property damage.

129.    Waste Management never provided Heller or Malone with the actual policy or certificates of insurance despite repeated follow up.

130.    Rather, on February 14, 2025, Max Dickman, the Director of Real Estate at Waste Management, told Heller via e-mail: "Unfortunately, the coverage is for more than the property in question and WM can't provide that as a matter of policy. If there is a legal obligation that you believe WM needs to comply with, please provide that and I'll see what can be done."

131.    On March 14, 2025, Heller's prior counsel spoke with Jeff Viola, the Assistant General Counsel, Eastern United States, Waste Management. During that call, Viola told Heller's prior counsel that he would provide a Certificate of Insurance reflecting liability insurance.

132.    Viola also told Heller's prior counsel during this call that he and Waste Management would look for paperwork and communications relating to insurance for the Property.

133.    On March 14, 2025, following the call, Viola sent Heller's prior counsel, attaching a Certificate of Insurance. The Certificate of Insurance evidenced liability insurance in the amount of $5 million per occurrence and an umbrella coverage amount of $15 million.

134.    The Certificate of Insurance did not mention insurance for the Property.

135.    On March 31, 2025, Jeff Viola, sent another e-mail to Heller's prior counsel, stating affirmatively: "I can confirm for you at the time of the incident in question it appears WM was not providing property coverage."

136. Thereafter, Waste Management continued to make misrepresentations about the insurance coverage for the Property.

137. On May 1, 2025, for example, Heller's prior lawyer spoke with Fabozzi again, at which time Fabozzi expressed doubts that Waste Management maintained insurance for the Property beyond 2013.

138. On May 16, 2025, Fabozzi wrote Heller's prior lawyer a letter, stating that Waste Management was evaluating whether it maintains insurance coverage applicable to the fire loss. In this letter, Fabozzi stated that it was "unclear if any of WM's insurance policies provide coverage for this loss." Fabozzi further stated that Greenstar (or Waste Management, as its successor) was not required to provide all-risk insurance coverage for the buildings and improvements on the Property under the Lease.

139. Further, in or around the spring of 2025, Heller and his prior lawyer had a conference call with Fabozzi.

140. On this call, Fabozzi told Heller that Waste Management only carried insurance on the Property for 2013.

141. During this call, which took place on or around June 5, 2025, Waste Management representatives, including Fabozzi, informed Heller that Waste Management was not required under the lease to carry insurance for the Property, and when Heller's representatives produced the 2013 letter and accompanying insurance certificates, Waste Management's representatives dismissed them as reflecting only Waste Management's responsibility to carry insurance under Section 8 of the Lease—not all-risk property coverage.

142. Heller continued to make efforts to learn whether Waste Management maintained insurance on the Property consistent with its July 2013 letter.

143. In connection with these efforts, in or around July 2025, Heller learned that FM Global Insurance Co. insured the Property through 2019.

144. On or around July 16, 2025, Heller spoke directly with representatives of FM Global, including Brice Slife and Stuart Hallagan, in-house counsel. FM Global confirmed to Heller that the Property was insured by FM Global until the end of FM Global's relationship with Waste Management in March of 2019. FM Global further confirmed that Heller was listed as a loss payee until the end of 2013—which explains why Heller was not notified when the FM Global policy was cancelled in 2019. This information contradicted Waste Management's prior representations.

145. On August 5, 2025, Heller's prior lawyer had another call with Fabozzi. During this call, Fabozzi said he could reach out to FM Global and ask for information relating to the Property coverage.

146. On August 20, 2025, Fabozzi confirmed to Heller's prior counsel that Waste Management and FM Global parted ways in 2019 after Waste Management decided to shift to a multi-insurance carrier structure.

147. During this call, Fabozzi told Heller's prior counsel that, after Waste Management switched to a multi-insurance carrier approach, the real estate division of Waste Management performed an internal audit and "moved away" from insuring the Property based upon the language in the Lease.

148. Thus, Waste Management made at least three affirmative representations to Heller or his agents that it had no insurance on the Property—(1) in the March 31, 2025, letter, (2) during a call with Fabozzi in the spring of 2025, and (3) during the August 20, 2025, call with Fabozzi.

149. Each of these representations was false.

-20-

150.    Indeed, after almost a year of stonewalling, Heller received an unsolicited Certificate of Insurance from Waste Management's insurance broker (Aon Risk Services Southwest, Inc.), evidencing coverage for the Property after the Lease ended, or from March 2026 through March 2027.

151.    After receiving this Certificate of Insurance, Heller then contacted the broker for further information and discovered that insurance had been in place for the Property all along— directly contradicting Waste Management's prior representations regarding no coverage.

152.    Even though Heller was named as a Certificate Holder, Aon would not provide copies of the policies to Heller without permission from Waste Management. Waste Management was upset that Heller had discovered its scheme to deny coverage.

153.    On April 29, 2026, Heller received copies of all Certificates of Insurance, which evidenced insurance for the Property for the last six years, beginning in March 2019, when Waste Management ceased its relationship with FM Global.

154.    The Certificates of Insurance evidenced the following coverage:

| Coverage Period | Insurer | Type of Insurance | Amount |
|---|---|---|---|
| March 1, 2019-March 1, 2020 | Zurich American Ins Company | All Risk-Subject to Exclusions | Rental Value** $10,000,000 and Blanket Bldg & PP $10,000,000 |
| March 1, 2020-March 1, 2021 | Zurich American Ins Company | All Risk-Subject to Exclusions | Rental Value** $10,000,000 and Blanket Bldg & PP $10,000,000, Extra Expense $25,000,000 |
| March 1, 2021-March 1, 2022 | Zurich American Ins Company | All Risk-Subject to Exclusions | Rental Value** $10,000,000 and Blanket Bldg & PP $10,000,000, Extra |

| | | | Expense $25,000,000 |
|---|---|---|---|
| March 1, 2022-March 1, 2023 | Zurich American Ins Company | All Risk-Subject to Exclusions | Rental Value** $10,000,000 and Blanket Bldg & PP $10,000,000, Extra Expense $25,000,000 |
| March 1, 2023-March 1, 2024 | Zurich American Ins Company | All Risk-Subject to Exclusions | Rental Value** $10,000,000 and Blanket Bldg & PP $10,000,000, Extra Expense $25,000,000 |
| March 1, 2024-March 1, 2025 | Starr Surplus Lines Insurance Company | All Risk-Subject to Exclusions | Rental Value $8,214,254 and Blanket Bldg & PP $8,214,254 |
| March 1, 2025-March 1, 2026 | Starr Surplus Lines Insurance Company | All Risk-Subject to Exclusions | Rental Value $8,214,254 and Blanket Bldg & PP $8,214,254 |

155.    In other words, Waste Management insured the Property from 2013 through at least March 2026, consistent with its original representation in its July 30, 2013, letter.

156.    Waste Management never provided Heller with these Certificates of Insurance, even though he should have been made aware of the changing coverage in accordance with the July 30, 2013, letter.

157.    Of note, one of the Certificates of Insurance provided to Heller in April 2026 had an effective date of March 1, 2024, with an expiration date of March 1, 2025—*i.e.*, during the loss period of February 4, 2025.

158.    The insured on that Certificate of Insurance was Waste Management, Inc. and all affiliated, related, and subsidiary companies.

159.    Heller was listed as a Certificate Holder, which means that he was included as a Loss Payee.

160.    The Certificate of Insurance covered all risk property damage in the amount of $8,214,254.

161.    This amount was the exact amount listed in the Certificate of Insurance covering all risk property damage attached to Waste Management's July 30, 2013, letter.

162.    Waste Management's failure to acknowledge the existence of insurance coverage and to submit a timely claim on Heller's behalf prevented remediation of the Property and the ability of Heller to re-lease it to CAP Glass Allentown, LLC , possibly for purposes of creating a recycling park.

163.    This recycling park would have been a direct competitor to Waste Management's facility constructed near Waste Management's landfill in Pen Argyl, Pennsylvania.

164.    Heller received the offer to develop the Property into a recycling park from CAP Glass Allentown, LLC on January 20, 2025, before the fire.

165.    The recycling park would have generated approximately $100,000 in monthly income, with little to no work on Heller's end.

166.    After the fire, and after Waste Management falsely represented that it had no insurance for the Property, the discussions surrounding the recycling park ended.

Glass Materials on the Property

167.    After the fire, and with the July 31, 2025, expiration date of the Renewal Term approaching, Heller explored various options for the future of the Property.

168.    One such option was the construction of one or two industrial warehouses on the Property.

169. To further explore the viability of this development opportunity, Heller selected Earth Engineering Incorporated ("EEI") to complete geotechnical surveys and Phase I and Phase II environmental testing on the Property.

170. The environmental testing was critical because a Phase I Environmental Site Assessment completed on the Property in January 2007, prior to Greenstar's acquisition, revealed no recognized environmental conditions and confirmed the Property was clean at the time Heller sold the business to Greenstar. The 2007 Phase I ESA specifically noted that the Property had been a cement manufacturing facility in the early 1900s and was later developed as Todd Heller Recycling, but found no environmental contamination requiring remediation.

171. Heller notified Waste Management of this activity.

172. EEI's analysis found FILL II and FILL III materials in several locations on the Property.

173. The geotechnical survey identified FILL II and FILL III materials in two primary areas of concern: (1) the area surrounding CAP Glass's plant on the northeast side of the Property, and (2) near the Baler Building. Aerial photographs obtained by EEI demonstrated that concrete areas surrounding CAP Glass's operations were added after 2010, indicating the buried glass was deposited during Greenstar's and CAP Glass's tenancy. EEI's test pits revealed material buried at depths requiring significant excavation to remediate.

174. FILL II material is red brown to gray and black sandy silt with gravel to silty gravel with sand, rock fragments, wood, metal, brick, plastic, boulder sized concrete fragments, ***abundant glass***, some stones and rubber, trace fabric, ceramics, oyster shells, and asbestos.

175. FILL III material is visually described as glass fragments.

176. The FILL II and FILL III materials were concentrated near Greenstar's and its sublessee's operations on the Property.

177. Heller notified Waste Management representatives Jim Van Woert and Jen Taylor of EEI's results in an e-mail dated September 17, 2025, and requested a call to discuss how the material will be removed from the Property by Waste Management.

178. Jen Taylor is the Environmental Protection Manager at Waste Management.

179. Thereafter, on November 4, 2025, Heller and Malone walked through the Property with Jim Van Woert and Eric Oehling.

180. Eric Oehling is a Construction Project Manager at Waste Management.

181. At that time, Heller and Malone requested an update on the buried glass removal.

182. Eric Oehling told Heller and Malone that he did not have any information on the buried material on the Property.

183. That same day (November 4, 2025), Malone re-sent the e-mail summarizing EEI's findings, and all accompanying materials, adding Eric Oehling to the correspondence.

184. On November 11, 2025, EEI drilled additional test borings as part of its expanded environmental testing on the Property. During this drilling period, several boring holes were drilled in the processing building to test for environmental concerns related to arsenic and the fire, which destroyed the building. EEI discovered six additional locations inside the processing building that contained abundant glass deposits.

185. On November 24, 2025, Malone followed up with Eric Oehling and Jen Taylor, notifying them that significant glass is buried inside the processing building on the Property, and provided them with copies of the test boring reports from EEI.

186. Jim Van Woert was also copied.

187.    In that e-mail, Malone asked to discuss Waste Management's plans to remove this material from the Property.

Arsenic on the Property

188.    In addition to finding FILL II and FILL III materials on the Property, the results of EEI's Phase II environmental analysis indicated that one soil sample from the Property returned an arsenic concentration that exceeded the Clean Fill, Reclamation Fill, and Regulated Fill standards for the Commonwealth of Pennsylvania.

189.    The 2007 Phase I ESA of the Property found no arsenic contamination. Accordingly, the elevated arsenic concentrations discovered in 2025 were not present before Greenstar began operations on the Property and were caused by materials deposited during Greenstar's and CAP Glass Allentown, LLC's tenancy.

190.    EEI thus recommended a widespread arsenic survey be completed on the Property.

191.    Heller informed Waste Management of the widespread arsenic survey in the September 17, 2025, e-mail, indicating that it would be completed in the coming weeks.

192.    Between November 13, 2025, and November 17, 2025, EEI then performed another investigation to (1) determine whether the exceeding arsenic concentration was an anomaly or indicative of a wider scale arsenic issue on the Property, and (2) delineate the affected area.

193.    As part of this investigation, EEI collected fourteen soil samples in the general vicinity of the exceeding arsenic location identified in EEI's first environmental analysis.

194.    EEI also collected samples from the underlying native soil.

195.    Of the fourteen soil samples, six exceeded the Commonwealth of Pennsylvania's Clean Fill limit for arsenic, while three soil samples exceeded all applicable health standards listed in EEI's report.

196.   None of the native soil samples exceeded any of the statewide health standards.

197.   EEI thus concluded that FILL material containing exceeding levels of arsenic was transported to the Property, and the FILL material was not contaminated due to on-site activities.

Second Amendment to Lease

198.   The Renewal Term of the Lease expired on July 31, 2025.

199.   Greenstar could not exit the Property by July 31, 2025 because all its processing equipment, and a significant amount of material, were still contained inside the processing building and baler building, and because its subtenant, CAP Glass Allentown, LLC could not exit the Property by that date.

200.   Waste Management thus looked to Heller for a solution to get CAP Glass Allentown, LLC to exit the Property, even though Greenstar, at all relevant times, maintained responsibility for its subtenant—and the subtenant's exit from the Property—under Section 10.1 of the Lease.

201.   In response, Heller offered potential options to Waste Management regarding CAP Glass Allentown, LLC's exit from the Property, without ever accepting responsibility for or assuming the sublease between Greenstar and CAP Glass Allentown, LLC.

202.   Waste Management had the option to allow the Lease to expire and enter a holdover tenancy under Section 16.4.

203.   Instead, Waste Management affirmatively chose to negotiate and execute the Second Amendment to Lease because it recognized that neither Greenstar nor CAP Glass Allentown, LLC could exit the Property by July 31, 2025. Waste Management's equipment remained inside the fire-damaged processing building, and CAP Glass Allentown, LLC was still actively operating.

204. Waste Management thus approached Heller and asked him to extend the Lease a second time.

205. Waste Management then started negotiating the Second Amendment to Lease with Heller.

206. Waste Management repeatedly delayed this process, and on July 31, 2025, when the Renewal Term expired, Waste Management had still not signed the Second Amendment to Lease.

207. Malone, via an August 4, 2025, e-mail to Fabozzi, expressed his displeasure with Waste Management's delay in finalizing the Second Amendment to Lease and informed Waste Management that Greenstar was a holdover tenant under the Lease.

208. Finally, on or around August 20, 2025, Heller and Greenstar executed the Second Amendment to Lease, which amended the Lease with respect to its Term, Rent, and other conditions. **Exhibit C**, Second Amendment to Lease. Waste Management, through its counsel Jonathan Fabozzi, returned the fully executed Second Amendment to Heller's counsel on August 20, 2025.

209. Notably, Waste Management, through its Senior Legal Counsel Jonathan Fabozzi, actively participated in the drafting and negotiation of the Second Amendment. On August 4, 2025, Fabozzi sent additional comments from Waste Management to the Second Amendment, confirming Waste Management's direct involvement in negotiating its terms.

210. Heller and Greenstar extended the Term of the Lease for an additional term, commencing on August 1, 2025, and ending February 28, 2026 (the "Extended Term"). *Id.*, Second Amendment to Lease, Article 2.1 (Term of Lease).

211.    Because the Property was a mess and littered with Greenstar's materials, Heller included specific language regarding Greenstar's clean-up obligations for the Property and provided a rent-reduction incentive for early clean-up in light of the possibility that Greenstar would exit the Property early.

212.    Heller and Greenstar agreed that the annual rent during the Extended Term would be $40,000 per month until such time that Greenstar, as Tenant, and its agents, contractors, affiliates, employees, and representatives fully completed, among other things, all of Tenant's work to clean the premises, remove all of Tenant's materials (including but not limited to recyclables and trash), empty all glass from the silos on the Property, and remove all subterranean glass from the Property (collectively, "Tenant's Clean-Up Operations"). **Exhibit C**, Article 3.1 (Annual Rent).  As noted below, if Greenstar completed its obligations before the Extended Term expired, Greenstar would receive a rent reduction.

213.    While Section 3.1 in the Second Amendment of the Lease obligated Greenstar to remove its materials ("remove all of Tenant's materials") from the Property, there was no such limitation with respect to the subterranean glass. *Id.*, Article 3.1(2).

214.    Rather, Greenstar agreed to remove "all subterranean glass" from the Property, regardless of its origin, before vacating its lease. *Id.*, Article 3.1(6).

215.    Heller and Greenstar thus understood how to limit certain Clean-Up Operations to Tenant's materials alone (*id.*, Article 3.1(2)) and expressly chose not to include such limitations with respect to the subterranean glass on the Property. *Id.* Article 3.1(6).

216.    Greenstar agreed to this language in the Second Amendment of the Lease.

217.    Waste Management, through its counsel, actively participated in the drafting and negotiation of the Second Amendment to Lease, including the Clean-Up Operations provisions.

Waste Management had every opportunity to strike or modify the provision requiring removal of all subterranean glass, yet accepted this provision without modification. Waste Management cannot now claim it was uninformed about what it was signing or negotiating.

218.    Upon completion of Tenant's Clean-Up Operations to the satisfaction of Landlord, the monthly rent payable would decrease to $25,000. *Id.*, Article 3.1 (Annual Rent).

219.    In addition to the above, Heller, as Landlord, extended his prior consent and written approval given to Greenstar, as Tenant, to sublease a portion of the Property to CAP Glass Allentown, LLC through the Extended Term and pursuant to the terms of the sublease agreement between Greenstar and CAP Glass. *Id.*, Consent to Continued Sublease.

220.    All other terms and conditions of the Lease continued in full force and effect.

221.    Heller would not have entered into the Second Amendment of the Lease had Greenstar not agreed to the Clean-Up Operations as understood above.

222.    Heller gave Waste Management every opportunity to avoid the Second Amendment to Lease. In the fall/winter of 2024, Heller offered Waste Management a lease extension, which Waste Management refused. The only reason Heller was open to the Second Amendment was because Waste Management approached Heller in June/July 2025 knowing that Waste Management would otherwise be in holdover. Heller was prepared to allow Waste Management to enter holdover status, but Waste Management chose to pursue the Second Amendment to remain on the Property.

223.    Waste Management had every chance to decline the Second Amendment and did not do so.

Lease Termination and Exit from the Property

224.    The Extended Term under the Second Amendment of Lease expired on February 28, 2026.

225.    After Greenstar and Heller signed the Second Amendment of Lease, VanWoert called Malone numerous times, asking how Heller was planning to address CAP Glass Allentown, LLC's exit from the Property. Malone told VanWoert that CAP Glass Allentown, LLC was Greenstar's responsibility and needed to exit the Property on February 28, 2026.

226.    On October 9, 2025, Heller's prior counsel sent a letter to Greenstar and CAP Glass Allentown, LLC, indicating the Lease between Greenstar and Heller would terminate on February 28, 2026 and not be extended beyond such date.

227.    On that same date, Malone forwarded a copy of this letter to Fabozzi and VanWoert, after which Fabozzi replied to Malone confirming receipt of the letter.

228.    In anticipation of the expiration date of the Extended Term, on January 23, 2026, Malone wrote to Jim VanWoert at Waste Management (who was seemingly serving as an agent of Greenstar), outlining Heller's expectations with respect to Greenstar's obligations under the Lease prior to exiting the Property.

229.    In his capacity at Waste Management, Jim VanWoert oversaw approximately thirty (30) Waste Management locations and was head of operations for the Greater Mid-Atlantic Market Area. All of Heller's discussions with Waste Management from the fall of 2024 through 2025 were directly with VanWoert. Everything in Greenstar's operations at 799 Smith Lane reported directly to Jim VanWoert.

230.    Malone identified that Heller expected the following:

a.  Final monthly rental payment of $40,000 to be received no later than February 5, 2026.

b.  CAP Glass Allentown, LLC, as Sublessee under the Sublease and the amendments thereto, will promptly exit the Property no later than 5:00 PM EST on February 28, 2026. If either Tenant or Sublessee occupied the Property after this date, then Section 16.4 of the Lease will take effect for the period beginning March 1, 2026.

c.  All equipment of Tenant, Sublessee, and any of their contractors, agents, or representatives will be removed from the Property no later than 5:00 PM EST on February 28, 2026.

d.  Tenant shall empty all glass from the silos on the Property.

e.  Tenant shall clean and remove all trash and refuse and materials from the tree line behind the location of Sublessee's operations.

f.  Tenant shall remove all subterranean glass from the Property.

231.    Malone noted in this letter that Heller previously provided geotechnical and environmental reports, test boring, and test pit reports, showing the presence of buried glass material in several locations on the Property.

232.    Malone further informed Waste Management that high concentrations of arsenic were found in FILL material, which were concentrated around Waste Management's and its sublessee's operations on the Property.

233.    VanWoert from Waste Management called Malone, stating that Waste Management received the letter and was evaluating its obligations as to the buried glass on the Property.

234.    Waste Management did not comment as to the other Clean-Up Operations on the Property.

235.    Waste Management did not comply with all of the Clean-Up Operations by February 28, 2026.

236.    After February 28, 2026, Greenstar's materials, including but not limited to recyclables and trash, remained on the Property, and they remain on the Property today. Also, Greenstar's subtenant, CAP Glass Allentown, LLC, did not timely vacate the Property.

237.    Further, after February 28, 2026, CAP Glass Allentown, LLC left a significant amount of material on the Property.

238.    In addition, Greenstar did not empty the glass from the silos on the Property, nor did Greenstar clean or remove all trash and refuse and materials from the tree line behind the location of the Sublessee's operations.

239.    Heller made repeated requests to Greenstar to fulfill its Clean-Up Operations under the Lease, which obligations Greenstar ignored.

240.    Because Greenstar failed to complete its Clean-Up Operations, Greenstar became a holdover tenant under Section 16.4 of the Lease, obligating Greenstar to pay 150% of the Annual Rent payable immediately prior to expiration, or $90,345 per month.

241.    To date, Tenant has not complied with all obligations set forth in the January 23, 2026, letter or paid the holdover rent, plus interest, due under the Lease. On May 7, 2026, Heller invoiced Greenstar for holdover rent for the months of March, April, and May 2026 in the total amount of $271,035. Greenstar disputed the invoice and has not paid.

242.    On June 1, 2026 Heller invoiced Greenstar for holdover rent for the month of June 2026 in the total amount of $90,345. Greenstar disputed the invoice and has not paid.

243.    The total amount in holdover rent currently due to Heller is $361,380. This amount will continue to increase each month Greenstar remains a holdover tenant.

### COUNT I – BREACH OF CONTRACT
### (FAILURE TO CLEAN THE PROPERTY UNDER SECTION 7.1 OF THE LEASE)
### PLAINTIFF V. GREENSTAR

244.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

245.    On August 30, 2007, Heller and Greenstar entered into the Lease, whereby Greenstar agreed to pay rent to Heller for its access to and use of the Property.

246.    The Lease was amended on June 9, 2022, and again on or around August 20, 2025.

247.    The Lease, and all subsequent amendments thereto, are valid and binding contracts between Heller and Greenstar.

248.    Section 7.1 of the Lease provides that Greenstar, upon expiration or termination of the Lease, agreed to remove its goods and effects and those of all persons claiming under it and to yield up peaceably to Landlord the [Property] in as good condition as when received, excepting deterioration caused by ordinary wear and tear, casualty, and condemnation."

249.    Section 7.1 remained in full force and effect after the First Amendment to Lease and the Second Amendment to Lease.

250.    Greenstar violated Section 7.1 of the Lease by exiting the Property without removing its goods and effects "and those of all persons claiming under it."

251.    Specifically, Greenstar exited the Property without (a) removing its recyclables and trash, (b) emptying the glass from the silos on the Property, (c) cleaning or removing from the tree line behind the location of the Sublessee's operations all trash and refuse and materials, (d)

removing all subterranean glass from the Property, or (e) ensuring its subtenant, CAP Glass Allentown, LLC, timely exited the Property.

252. In addition, Greenstar failed to remove the arsenic identified by EEI from the Property.

253. As a result of Greenstar's breach, Heller has incurred and will continue to incur substantial damages in the form of clean-up costs, including but not limited to costs for removal of buried glass, contaminated fill materials containing arsenic, recyclables, trash, and other debris.

254. As a result of Greenstar's breach, Heller has been unable to lease the Property to a new tenant.

255. Greenstar's breach of Section 7.1 of the Lease has caused and continues to cause Heller damages in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Greenstar for compensatory damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT II – BREACH OF CONTRACT**
**(FAILURE TO FULFILL TENANT'S CLEAN-UP OPERATIONS**
**UNDER ARTICLE 3.1 OF THE SECOND AMENDMENT TO LEASE)**
**PLAINTIFF V. GREENSTAR**

256. Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

257. On August 30, 2007, Heller and Greenstar entered into the Lease, whereby Greenstar agreed to pay rent to Heller for its access to and use of the Property.

258. The Lease was amended on June 9, 2022, and again on or around August 20, 2025.

259.    The Lease, and all subsequent amendments thereto, are valid and binding contracts between Heller and Greenstar.

260.     Article 3.1 of the Second Amendment to Lease provides that Greenstar, as Tenant, must engage in certain Clean-Up Operations.

261.    Those Clean-Up Operations obligated Greenstar to clean the premises, remove all Greenstar's materials (including but not limited to recyclables and trash), empty all glass from the silos on the Property, and remove all subterranean glass from the Property.

262.    Upon completion of the Clean-Up Operations to the satisfaction of Landlord, the monthly rent payable would decrease to $25,000.

263.    Greenstar paid Heller the full rent amount of $40,000 per month during the Extended Term and never paid the decreased monthly rent of $25,000 pursuant to Article 3.1 of the Second Amendment to Lease because it never completed its Clean-Up Operations.

264.    Greenstar violated Article 3.1 of the Second Amendment to Lease by exiting the Property without removing its goods and effects "and those of all persons claiming under it."

265.    Specifically, Greenstar exited the Property without (a) removing its recyclables and trash, (b) emptying the glass from the silos on the Property, (c) cleaning or removing from the tree line behind the location of the Sublessee's operations all trash and refuse and materials, (d) removing all subterranean glass from the Property, or (e) ensuring its subtenant, CAP Glass Allentown, LLC, exited the Property.

266.    In addition, Greenstar failed to remove the arsenic identified by EEI from the Property.

267.    To date, Waste Management has never requested a final inspection or walk-through of the Property to ensure its Clean-Up Operations were completed to Heller's satisfaction as

required by the Second Amendment to Lease. Instead, Waste Management simply walked away from the Property, leaving Heller with an unleased property contaminated with Greenstar's materials, recyclables, trash, and subterranean glass.

268.    As a result of Greenstar's breach, Heller has incurred and will continue to incur substantial damages in the form of clean-up costs, including but not limited to costs for removal of buried glass, contaminated fill materials containing arsenic, recyclables, trash, and other debris.

269.    As a result of Greenstar's breach, Heller has been unable to lease the Property to a new tenant.

270.    Greenstar's breach of Article 3.1 of the Second Amendment to Lease has caused and continues to cause Heller damages in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Greenstar for compensatory damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

### COUNT III – BREACH OF CONTRACT
### (HOLDOVER TENANCY)
### PLAINTIFF V. GREENSTAR

271.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

272.    On August 30, 2007, Heller and Greenstar entered into the Lease, whereby Greenstar agreed to pay rent to Heller for its access to and use of the Property.

273.    The Lease was amended on June 9, 2022, and again on or around August 20, 2025.

274.    The Lease, and all subsequent amendments thereto, is a valid and binding contract between Heller and Greenstar.

-37-

275.    Under the Second Amendment to Lease, the Extended Term of the Lease expired on February 28, 2026.

276.    At that time, Greenstar was required to exit the Property and fulfill all Clean-Up Operations as outlined in the Lease and the amendments thereto.

277.    In addition, Greenstar was required to ensure any sublessee, including CAP Glass Allentown, LLC, exited the Property and complied with the Clean-Up Operations in the Lease and all amendments thereto.

278.    Greenstar violated the Lease and the amendments thereto by failing to fulfill its Clean-Up Operations.

279.    Specifically, Greenstar exited the Property without (a) removing its recyclables and trash, (b) emptying the glass from the silos on the Property, (c) cleaning or removing from the tree line behind the location of the Sublessee's operations all trash and refuse and materials, or (d) removing all subterranean glass from the Property.

280.    In addition, Greenstar failed to remove the arsenic identified by EEI from the Property.

281.    Greenstar also failed to ensure its sublessee, CAP Glass Allentown, LLC, exited the Property by February 28, 2026.

282.    On October 9, 2025, Heller, as Landlord, through his prior counsel notified Greenstar, as Tenant, and CAP Glass Allentown, LLC, as Sublessee, that the Lease between Greenstar and Heller would expire February 28, 2026 and not be renewed or extended.

283.    On January 23, 2026, Heller, as Landlord, notified Greenstar, as Tenant, for a second time that CAP Glass Allentown, LLC, as Sublessee, was required to promptly exit the Property no later than 5:00 P.M. Eastern Standard Time on February 28, 2026.

284. Greenstar took no actions to ensure its subtenant exited the Property.

285. To date, there is still material on the Property and CAP Glass Allentown, LLC actively occupied the Property until at least mid-May 2026.

286. By failing to perform its contractual obligations under the Lease and Second Amendment to Lease, as stated above, and by allowing its subtenant to remain on the Property after expiration of the Lease, Greenstar triggered Section 16.4 of the Lease relating to holdover rent.

287. To date, Greenstar has not paid Heller any holdover rent.

288. As a result of Greenstar's breach, Heller has been unable to lease the Property to a new tenant.

289. Greenstar's breach of the Lease and all amendments thereto has caused and continues to cause Heller damages in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Greenstar for compensatory damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT
### (BREACH OF SECTION 6.3 OF THE LEASE
### PLAINTIFF V. GREENSTAR

290. Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

291. On August 30, 2007, Heller and Greenstar entered into the Lease, whereby Greenstar agreed to pay rent to Heller for its access to and use of the Property.

292. The Lease was amended on June 9, 2022, and again on or around August 20, 2025.

293.    The Lease, and all subsequent amendments thereto, is a valid and binding contract between Heller and Greenstar.

294.    Section 6.3 of the Lease (Tenant's Alterations) provided, in relevant part, that Tenant shall have the right, from time to time, to redecorate the Demised Premises and to make such alterations and changes in such parts thereof as Tenant shall deem expedient or necessary for its purposes; provided, however, that such alterations and changes when completed shall neither impair the structural soundness nor materially diminish the value of the Demised Premises.

295.    Section 6.3 of the Lease remained in full force and effect after the First Amendment to Lease and Second Amendment to Lease.

296.    Greenstar violated Section 6.3 of the Lease by pouring concrete foundation, an unsuitable FILL material, on top of the buried glass located on the Property.

297.    This alteration, made solely by Greenstar, materially diminished the value of the Property, as any future developer will need to incur costs to remove the unsuitable FILL material and will count such costs against the purchase price of the Property.

298.    Greenstar's breach of the Lease has caused and continues to cause Heller damages in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Greenstar for compensatory damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

### COUNT V – FRAUD
### PLAINTIFF V. WASTE MANAGEMENT

299.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

-40-

300.   On July 30, 2013, Waste Management sent Heller a letter, indicating that it would "fully cover" all insurance obligations under the Lease.

301.   With this letter, Waste Management included a Certificate of Insurance identifying coverage for the Property for all risk property damage in the amount of $8,214,254.

302.   Heller relied on Waste Management's statements in its July 30, 2013, letter and accompanying Certificate of Insurance in good faith and cancelled the insurance he maintained on the Property in accordance with Section 13.1 of the Lease. Heller's prior policy, issued by Selective Insurance Company, was cancelled effective August 14, 2013, solely because Waste Management represented it would provide insurance coverage for the Property.

303.   Prior to Waste Management's acquisition of Greenstar in 2013, Heller had maintained insurance on the Property through his personal insurance agent for years. This policy pre-existed the sale of the business in 2007 and continued through the Greenstar acquisition and lease of the Property. Waste Management's July 30, 2013 letter and accompanying Certificates of Insurance were the sole trigger for Heller to cancel his pre-existing insurance policy. Had Waste Management not made these representations assuring insurance coverage, Heller would have had no reason to cancel his pre-existing policy.

304.   After the February 4, 2025 fire at the Property, Heller asked Waste Management for a copy of the applicable Policy.

305.   In response, Waste Management knowingly and intentionally misrepresented a material fact to Heller, namely that Waste Management did not have insurance on the Property. As set forth in Paragraphs 131 through 149 above, Waste Management repeatedly refused to provide insurance information and affirmatively represented that it did not maintain property

insurance. For example, on February 14, 2025, Max Dickman stated Waste Management could not provide the insurance information "as a matter of policy."

306.    In addition, on March 31, 2025, Jeff Viola, Waste Management's Assistant General Counsel, admitted via email: "Our problem is we have a lease that says one thing and it appears our predecessor may have provided a property policy when the lease didn't require it. . . . But I can confirm for you at the time of the incident in question it appears WM was not providing property coverage." This admission, combined with subsequent discovery that Waste Management did maintain insurance on the Property throughout the relevant period, demonstrates that Waste Management knowingly misrepresented the existence of insurance coverage to Heller.

307.    On August 20, 2025, Heller's counsel spoke with Jonathan Fabozzi, who reported that FM Global and Waste Management "parted ways in 2019 after WM decided to shift to a multi-insurance carrier structure." Fabozzi also stated that after this switch, Waste Management's real estate division "performed an internal audit and his conclusion is that the real estate division moved away from the insurance coverage based upon the plain language in the lease agreement." This statement was false, as Waste Management maintained insurance on the Property after 2019 and during the loss period.

308.    Waste Management made these misrepresentations under circumstances and at a time when it knew or should have known of the falsity of this representation, as Waste Management did maintain all-risk insurance on the Property during the loss period.

309.    Waste Management's misrepresentations were material because Heller would have submitted a timely claim for insurance if he had access to the applicable insurance policy.

310.    Waste Management made these representations with the intent that Heller rely upon it and not submit an insurance claim under the applicable insurance policy.

311.    Waste Management's conduct was intentional, willful, and malicious, warranting an award of punitive damages to deter similar conduct and to punish Waste Management.

312.    Heller justifiably relied in good faith on the representations made by Waste Management that it did not have insurance on the Property.

313.    This justifiable reliance resulted in injury to Heller.

314.    If Waste Management had disclosed the applicable insurance Policy at the time Heller requested it, Heller would have been able to make a timely notice of claim to the insurers.

315.    As a result of his reasonable reliance on Waste Management's representations, Heller has been harmed in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Waste Management for compensatory damages, punitive damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT VI – NEGLIGENT MISREPRESENTATION
## PLAINTIFF V. WASTE MANAGEMENT

316.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

317.    On July 30, 2013, Waste Management sent Heller a letter, indicating that it would "fully cover" all insurance obligations under the Lease.

318.    With this letter, Waste Management included a Certificate of Insurance identifying coverage for the Property for all risk property damage in the amount of $8,214,254.

319.    Heller relied on Waste Management's statements in its July 30, 2013, letter and accompanying Certificate of Insurance in good faith and cancelled the insurance he maintained on the Property in accordance with Section 13.1 of the Lease.

320.    After the February 4, 2025 fire at the Property, Heller asked Waste Management for a copy of the applicable Policy.

321.    Waste Management was under a duty to provide accurate information to Heller concerning the insurance coverage for the Property.

322.    In response, Waste Management negligently made an incorrect statement of a material fact to Heller, namely that Waste Management did not have insurance on the Property. As set forth in Paragraphs 131 through 149 above, Waste Management repeatedly refused to provide insurance information and affirmatively represented that it did not maintain property insurance.

323.    For example, in the spring of 2025, Jonathan Fabozzi told Heller that Waste Management only carried insurance on the Property for 2013.

324.    Further, on March 31, 2025, Jeff Viola, the Assistant General Counsel, Eastern United States, Waste Management, sent an e-mail to Heller's prior counsel, stating affirmatively: "I can confirm for you at the time of the incident in question it appears WM was not providing property coverage."

325.    Waste Management made this negligent misrepresentation under circumstances and at a time when it knew or should have known of the falsity of this representation, as Waste Management did maintain all-risk insurance on the Property during the loss period.

326.    Waste Management made this negligent representation with the intent that Heller rely upon them and not submit an insurance claim under the applicable insurance policies.

327.    Waste Management's misrepresentation was material because Heller would have submitted a timely claim for insurance if he had access to the applicable insurance policy.

328.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless, outrageous, and wanton fashion, with a conscious indifference to the rights of Heller.

329.    Heller justifiably relied in good faith on the representations made by Waste Management that it did not have insurance on the Property.

330.    This justifiable reliance resulted in injury to Heller.

331.    If Waste Management had disclosed the applicable insurance Policy at the time Heller requested it, Heller would have been able to make a timely notice of claim to the insurers.

332.    As a result of his reasonable reliance on Waste Management's representations, Heller has been harmed in an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Waste Management for compensatory damages, punitive damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT VII – NEGLIGENCE**
**PLAINTIFF V. WASTE MANAGEMENT AND GREENSTAR**

333.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

334.    Pursuant to the Restatement (Second) of Torts, one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. Restatement (Second) of Torts § 324A; *see also Masciulli*

*v. Imperial Security Servs.*, 2026 WL 1395933, at *4 (E.D. Pa. May 19, 2026) ("Pennsylvania courts have adopted Section 324A of the Restatement (Second) of Torts").

335.    Waste Management undertook the responsibility for maintaining a fire suppression system for the processing building where the fire occurred.

336.    The fire suppression was inadequate, as it did not cover the full square footage of the building.

337.    Under Section 6.2 of the Lease, "[a]ny damage sustained by any party caused by mechanical, electrical, plumbing or any other equipment or installations, whose maintenance and repair is the responsibility of Tenant, shall be paid by Tenant and Tenant shall indemnify and hold Landlord harmless from and against any and all claims, actions, damages and liability in connection therewith. Tenant's obligations under this section shall expressly survive termination of the Lease."

338.    Engineering Specialists, Inc. determined that the February 4, 2025 fire originated in Optical Sorter #21, which was equipment owned and operated by Greenstar and/or Waste Management, and whose maintenance and repair was the responsibility of Tenant under Section 6.2 of the Lease.

339.    Accordingly, under Section 6.2 of the Lease, Greenstar has a duty to indemnify Heller for the fire damage caused by Optical Sorter #21.

340.    Waste Management and Greenstar undertook the responsibility for procuring insurance for the Property under the Lease in accordance with Waste Management's July 30, 2013, letter to Heller, which included a Certificate of Insurance indicating that Waste Management had obtained all-risk insurance for the Property.

341. Heller relied on Waste Management's statements in its July 30, 2013, letter and accompanying Certificate of Insurance in good faith and cancelled the insurance he maintained on the Property in accordance with Section 13.1 of the Lease.

342. At that point, Heller stopped sending invoices from the insurance carriers to Greenstar for payment.

343. Greenstar (and Waste Management, its successor) thus knew that Heller was no longer insuring the Property.

344. As such, Waste Management and Greenstar were responsible for insuring the Property.

345. Waste Management and Greenstar also had a duty to inform Heller if the insurance obtained by Waste Management and Greenstar as outlined in the July 30, 2013, letter lapsed.

346. At no point between July 30, 2013, and February 4, 2025, did Waste Management or Greenstar notify Heller that they were no longer procuring all-risk insurance for the Property.

347. As such, from July 30, 2013, through February 4, 2025, Waste Management and Greenstar insured the Property in accordance with the July 30, 2013, letter from Waste Management.

348. After the February 4, 2025 fire at the Property, Waste Management and Greenstar had a duty to timely submit an insurance claim under the applicable policy.

349. Waste Management and Greenstar failed to submit an insurance claim under the policy for the fire damage at the Property.

350. Waste Management and Greenstar further failed to provide Heller with a copy of the applicable policy so that he could make an insurance claim himself.

351. Instead, Waste Management informed Heller that it did not have insurance.

352.    This was a material misrepresentation, as Waste Management did maintain all-risk insurance on the Property during the loss period.

353.    Waste Management made this misrepresentation under circumstances and at a time when it knew or should have known of the falsity of this representation, as Waste Management always had in its possession, custody, and control a copy the applicable Certificate of Insurance, which had an effective date of March 1, 2024, with an expiration date of March 1, 2025—*i.e.*, during the loss period of February 4, 2025.

354.    By failing to submit an insurance claim or provide Heller a copy with the applicable policy such that he could submit an insurance claim himself, Waste Management and Greenstar negligently, recklessly, and outrageously breached the duties they owed to Heller.

355.    The acts and omissions of Waste Management and Greenstar were done in a negligent, grossly negligent, willful, reckless, outrageous, and wanton fashion, with a conscious indifference to the rights of Heller.

356.    By reason of the negligence of Waste Management and Greenstar, Heller has been damaged for an amount to be proven at trial.

WHEREFORE, Heller demands judgment against Waste Management and Greenstar for compensatory damages, punitive damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

### COUNT VIII – LOST REVENUE DUE TO NEGLIGENT CONDUCT
### PLAINTIFF V. WASTE MANAGEMENT AND GREENSTAR

357.    Heller incorporates by reference the averments contained in the preceding paragraphs as though the same were fully set forth herein at length.

358.    On January 20, 2025, prior to the fire that destroyed the processing building and baler building, Heller received an offer from CAP Glass Allentown, LLC to develop the Property

into a recycling park that would have generated approximately $100,000 per month in rental income.

359.    On February 4, 2025, a fire destroyed the processing building and baler building on the Property, which together totaled approximately 51,768 square feet.

360.    Waste Management failed to maintain an adequate fire suppression system on the Property, and this failure caused the fire to destroy the processing building and baler building.

361.    After the fire, Waste Management falsely represented to Heller that it had no insurance coverage for the Property, and Waste Management concealed from Heller insurance certificates showing continuous coverage from 2013 through present.

362.    Following the fire, and in reliance on Waste Management's false representations regarding insurance, the recycling park discussions ended because the destroyed buildings could not be replaced without insurance proceeds.

363.    As a direct and proximate result of Waste Management's fraud (Count V), negligent misrepresentation (Count VI), and negligence (Count VII), and Greenstar's negligence (Count VII), Heller lost the prospective lease revenue from the recycling park development that would have commenced but for the fire and Waste Management's misconduct.

364.    The lost prospective lease revenue claim arises from tortious conduct—including fraud, negligent misrepresentation, and negligence—that is independent of and distinct from the holdover damages claim arising under Section 16.4 of the Lease.

365.    The lost prospective lease revenue sought in this Count VIII compensates Heller for the destruction of buildings and the loss of income-generating capacity that would have been realized through the recycling park development, and does not overlap with the holdover rent

sought in Count III, which compensates Heller for Greenstar's unauthorized post-lease-expiration occupancy of the Property as it currently exists.

366.    By reason of the foregoing, Heller has been damaged in an amount to be proven at trial, including but not limited to lost monthly income of approximately $100,000, measured from the date the new lease would have commenced but for the fire and Waste Management's misconduct, for a reasonable prospective lease term.

WHEREFORE, Heller demands judgment against Waste Management and Greenstar for compensatory damages, punitive damages, costs, counsel fees, pre-judgment and post-judgment interest, and such other relief as the Court deems just and proper.

## JURY DEMAND

Heller hereby demands a trial by jury as to all issues so triable herein.

Dated: June 24, 2026

s/ Steven Pachman
Steven Pachman
Ross A. Fox* (*pro hac vice* motion forthcoming)
Brett M. Waldron
Kimberly L. Sachs

MONTGOMERY MCCRACKEN WALKER & RHOADS LLP

*Attorney for Plaintiff Todd A. Heller*