**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TODD A. HELLER,<br>Plaintiff,<br><br>v.<br><br>GREENSTAR, LLC, WASTE MANAGEMENT, INC.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 5:26-cv-4354 |

**OPINION**
**Defendant Waste Management, Inc.'s Motion to Dismiss, ECF No. 10 – Denied**

**Joseph F. Leeson, Jr.** **September 2, 2026**
**United States District Judge**

## I. INTRODUCTION

Plaintiff Todd A. Heller brought the present action against Defendants Waste Management, Inc. ("WMI") and Greenstar, LLC, following a fire at a property located in Northampton, Pennsylvania. Specifically, against WMI, he alleged fraud, negligence, negligent misrepresentation, and loss due to negligent conduct, under Pennsylvania law. WMI filed a Motion to Dismiss for lack of both general and specific personal jurisdiction. For the reasons that follow, the Court denies the Motion.

## II. BACKGROUND

### A. Factual Background

WMI is a corporation organized and existing under the laws of the State of Delaware that maintains its principal place of business in Houston, Texas. *See* Compl. ¶ 7, ECF No. 1.

Before "September 4, 2007, Heller owned all issued and outstanding shares of capital stock of Todd Heller, Inc., a corporation engaged in the" recyclables business. Compl. ¶ 3. Heller

presently owns "real property located at 799 Smith Lane, Northampton, Pennsylvania[.]" *Id.* ¶ 2. In the 1990s, Heller owned and operated his business at the 799 Smith Lane property. *See id.* ¶¶ 21–22. "In September 2007, Greenstar contracted to purchase the [b]usiness from Heller, . . . , for $58.75 million pursuant to an Asset Purchase Agreement[.]" *Id.* ¶ 23. Greenstar Allentown, LLC purchased some of Todd Heller, Inc.'s assets. *See id.* ¶ 24. Greenstar Allentown, LLC is a Delaware limited liability company, of which Defendant Greenstar is the sole member. *See id.* ¶¶ 25–26.

After the closing, Greenstar operated its business at the 799 Smith Lane property. *See id.* ¶ 41. On August 30, 2007, Heller and Greenstar entered "a Lease Agreement (the "Lease"), by which Heller, as Landlord, leased to Greenstar, as Tenant, the Property and all improvements thereon, including, without limitation, the glass plant, the bead plant, the commingled building, the metal warehouse, and the office." *Id.* ¶ 51; *see also* Ex. A, the Lease, Section 1.1, ECF No. 1-1. "Under Section 8.1 of the Lease, Greenstar, as Tenant, was required to maintain at its sole cost and expense public liability insurance with limits of not less than $1,000,000 for injury or death and $5,000,000 in the aggregate, insuring Landlord (Heller) and Tenant (Greenstar) against injury to persons or damage to the [p]roperty, with Landlord (Heller) named as an additional insured." Compl. ¶ 60. "Under Section 13.1 of the Lease, Landlord (Heller) was required to maintain all-risk insurance (including rent insurance) on all buildings and improvement." *Id.* ¶ 62. "During the initial term of the Lease, and any extension thereof, the Tenant (Greenstar) was required to reimburse Landlord (Heller), as additional rent, the cost of such insurance coverage." *Id.* ¶ 63. For the first six years of the Lease (August 2007 through July 2013), Heller maintained all-risk insurance pursuant to Section 13.1 of the Lease and submitted invoices from the

insurance carrier to Greenstar for reimbursement. *See id.* ¶¶ 64, 86. Greenstar then began paying the insurance carrier directly in installments. *See id.* ¶ 65.

On January 31, 2013, WM Recycle America, LLC, a subsidiary of Waste Management, Inc., acquired the stock of Greenstar. *See id.* ¶¶ 10, 84. Heller then received rent payments for Greenstar's use of the property from a Waste Management "entity located in Houston, Texas, where [WMI] has its headquarters." Todd Heller Decl. ¶¶ 10–11, ECF No. 16-3. Houston is also where WMI performs its administrative and executive functions. *See* Courtney Tippy Decl. ¶ 8, ECF No. 10-4. Additionally, a Waste Management entity located in Chicago, Illinois, paid the real estate taxes on the property. *See* Heller Decl. ¶¶ 12–13. Moreover, all notices to Greenstar pursuant to its sublease with CAP Glass Allentown, LLC were to be sent to 1001 Fannin Street in Houston ("where [WMI's] corporate headquarters was previously located."). *Id.* ¶¶ 52–54. From January 31, 2013, onward, Heller communicated directly with "WM" personnel "regarding his relationship with Greenstar." Compl. ¶ 12.

On July 30, 2013, James Campbell Kean, a lawyer in "Waste Management's Law Department," sent Heller a letter advising that the "WM insurance department" obtained insurance for the property at 799 Smith Lane and "that the previously existing insurance provided [by] Greenstar will be canceled." *Id.* ¶¶ 87–88; *see also* Ex. 3, ECF No. 16-6. The letter was addressed from Houston, Texas and had a "WM" letterhead. *Id.* Included with the letter were two Certificates of Insurance. *See* Compl. ¶¶ 88–93; *see also* Ex. 3 at 3–4. The first Certificate of Insurance was dated July 9, 2013, with the effective term from February 1, 2013, through January 1, 2014. *See* Ex. 3 at 3. It covered general liability, automobile liability, and worker's compensation and employers' liability, and named "Waste Management Holdings, Inc. & All Affiliated, Related, & Subsidiary Companies, Including: Greenstar Allentown, LLC" as

the insured. *Id.* It identified Heller as the Certificate Holder. *See id.*; *see also* Heller Decl. ¶ 23. The second Certificate of Insurance had an effective date of January 1, 2012, and expired on January 1, 2014, covered property damage for 799 Smith Lane in the amount of $8,214,254, and listed only one insured—Waste Management, Inc. *See* Ex. 3 at 4; *see also* Compl. ¶¶ 93–97. On it, Heller was listed as the Loss Payee. *See* Compl. ¶ 99; *see also* Ex. 3 at 4; *see also* Heller Decl. ¶ 27. Heller allegedly relied on the representations in and attachments to the July 2013 letter and canceled the insurance he maintained on the property on August 14, 2013. *See* Compl. ¶¶ 100–102.

The insurance broker Hub International confirmed the cancellation in a letter to Greenstar dated August 24, 2013. *See id.* ¶ 103. Hub International spoke with Leah Shoemaker, one of Greenstar's agents, who told Hub "that Waste Management had taken over the insurance on the [799 Smith Lane p]roperty." *Id.* ¶¶ 104–105.

On February 4, 2025, a "multi-day fire engulfed two buildings" on the 799 Smith Lane property, "resulting in significant damage and related costs and expenses." *Id.* ¶ 107. Heller notified WMI of his filing of an insurance claim shortly after the fire. *See id.* ¶ 125.

Heller contacted various "Waste Management" employees, three of whom used the "WM" or "Waste Management" service mark in their communications with Heller. Heller Decl. ¶¶ 33, 35, 38. Specifically, on February 14, 2025, Max Dickman, whose e-mail signature line identified him as the Director of Real Estate for "WM," stated in an email that "WM" could not provide Heller with the applicable insurance information "as a matter of policy." Compl. ¶¶ 130, 305; *see also* Heller Decl. ¶¶ 31–32; *see also* Ex. 4, ECF No. 16-7. Similarly, on March 31, 2025, Jeff Viola, the Assistant General Counsel, Eastern United States, for "WM," wrote an email to Heller's prior counsel stating, "[o]ur problem is we have a lease that says one thing and

it appears our predecessor may have provided a property policy when the lease doesn't require it. . . . But I can confirm for you at the time of the incident in question it appears WM was not providing property coverage." Compl. ¶¶ 135, 306; *see also* Heller Decl. ¶ 34; *see also* Ex. 5, ECF No. 16-8. Viola apparently told Heller's prior counsel on a March 14, 2025 phone call "that he would provide a Certificate of Insurance reflecting liability insurance." Compl. ¶ 131. Additionally, on May 16, 2025, Jonathan Fabozzi, Senior Legal Counsel for "WM," wrote Heller's prior counsel a letter, stating that it was "unclear if any of WM's insurance policies provide coverage for this loss." Compl. ¶ 138; *see also* Heller Decl. ¶ 37; *see also* Ex. 6, ECF No. 16-9. Fabozzi cited Section 13.1 of the Lease Agreement, which said that the landlord (Heller) would maintain all-risk insurance on all buildings and improvements on the property, and noted that "there is no indication that [the 2013] discussions, or any arrangements made at that time between the parties [including the Kean letter], constituted a formal, binding amendment of the lease agreement which would have affected Heller's original insurance obligations[.]" Ex. 6 at 2. Fabozzi had also told Heller over the phone in spring 2025 that he needed to "push things up the chain" before responding to Heller's inquiries about insurance. Heller Decl. ¶ 40; *see also* Compl. ¶¶ 139–141.

In July 2025, "Heller learned that FM Global Insurance Co. [("FM Global")] insured the [799 Smith Lane p]roperty through 2019." Compl. ¶ 143. On July 16, 2025, Heller spoke with representatives of FM Global, who confirmed that FM Global insured the property at 799 Smith Lane "until the end of FM Global's relationship with [WMI] in March of 2019." *Id.* ¶ 144. "FM Global further confirmed that Heller was listed as a loss payee until the end of 2013[.]" *Id.* On August 20, 2025, Heller's prior counsel spoke with Fabozzi, who reported that FM Global and Waste Management "parted ways in 2019 after [WM] decided to shift to a multi-insurance

carrier structure." Compl. ¶¶ 146, 307. Fabozzi also maintained that, after the shift, WMI's real estate division "performed an internal audit and his conclusion is that the real estate division 'moved away' from the insurance coverage based upon the plain language in the lease agreement." *Id.* ¶¶ 147, 307.

Over a year later, on April 29, 2026, Heller received another Certificate of Insurance from WMI's insurance broker (Aon Risk Services Southwest, Inc.). *See* Compl. ¶¶ 150–153; *see also* Ex. 7, ECF No. 16-10; Heller Decl. ¶¶ 41–47. Heller, through counsel, submitted claims to the insurers listed on the Certificate of Insurance. *See* Heller Decl. ¶ 48. On July 20, 2026, Sedgwick, the claims administrator for WMI's insurers, responded and identified the insured as WMI, the loss location as 799 Smith Lane, and the date of loss as February 2, 2025: around the date of the fire. *See* ECF No. 10-6 at 1; *see also* Heller Decl. ¶¶ 49, 51. Sedgwick based its review upon "information received from [WMI], [Heller's l]etter, and the [C]ertificate of [I]nsurance dated April 29, 2026." ECF No. 10-6 at 1. Sedgwick also noted that WMI submitted a claim for its equipment damage for equipment in Pennsylvania but acknowledged that Heller was "responsible for insuring and repairing the [b]uilding." *Id.* at 2. Sedgwick wrote that (1) "neither Mr. Heller nor the [b]uilding [located on the 799 Smith Lane property] is insured under the Policies[;]" and (2) "Mr. Heller is not a loss payee under the Policies. As such, it is Insurers' position that Mr. Heller is not entitled to recover for the [b]uilding damage under the Policies." *Id.* at 2.

**B. Procedural History**

Heller filed the Complaint on June 24, 2026. *See* Compl. Heller brought eight claims. First, breach of contract for failure to clean the property against Greenstar. *See id.* ¶¶ 244–255. Second, breach of contract for failing to fulfill the tenant's clean-up operations against Greenstar. *See id.* ¶¶ 256–270. Third, breach of contract for holdover tenancy against Greenstar. *See id.* ¶¶

271–289. Fourth, breach of contract based on breach of Section 6.3 of the Lease against Greenstar. *See id.* ¶¶ 290–298. Fifth, fraud against WMI. *See id.* ¶¶ 299–315. Sixth, negligent misrepresentation against WMI. *See id.* ¶¶ 316–332. Seventh, negligence against WMI and Greenstar. *See id.* ¶¶ 333–356. Eighth, lost revenue due to negligent conduct against WMI and Greenstar. *See id.* ¶¶ 357–366. Heller alleges that WMI made a misrepresentation when the three representatives told him that WMI did not maintain insurance for the 799 Smith Lane property, when he believed from Kean's letter that WMI would cover insurance for the property. *See* Compl. ¶¶ 126–141, 300–307; *see also* Heller Decl. ¶ 39.

On July 27, 2026, WMI filed a Motion to Dismiss for a lack of general and specific personal jurisdiction over WMI. *See* Mot., ECF No. 10. In its Memorandum, WMI acknowledged that Sedgwick was "the claims administrator for WMI's insurers[.]" Mot. Mem. 3, ECF No. 10-1. WMI attached multiple exhibits in support of its argument, including a Declaration by Courtney Tippy, the Vice President of Corporate Strategy for WMI. *See* Tippy Decl. WMI also attached the Sedgwick letter. *See* ECF No. 10-6. Finally, WMI attached the service of process form. *See* ECF No. 10-5.

Heller filed a Response in Opposition to the Motion to Dismiss on August 10, 2026. *See* Resp., ECF No. 16. In it, Heller conceded that it appeared that WMI was not "at home" in Pennsylvania and reserved its general personal jurisdiction argument should the Court permit the parties to engage in jurisdictional discovery. *See id.* at 12 n.1. Heller maintained that the Court could exercise specific personal jurisdiction over WMI under the traditional minimum contacts test because WMI had a contract to insure property in Pennsylvania. *See id.* at 13–17 (citing 42 Pa. Cons. Stat. Ann. § 5322(a)(6)(i)). Additionally and alternatively, Heller alleged the Court could exercise specific personal jurisdiction over WMI because WMI committed an intentional

tort targeted at Pennsylvania. *See* Resp. 17–18. In the alternative, Heller requested that the Court permit the parties to engage in jurisdictional discovery. *See* Resp. 18–22. In addition to his brief, Heller attached numerous exhibits to reflect WMI's contacts in Pennsylvania. *See* Heller Decl.; *see also* Ex. 1, ECF No. 16-4 (the 1099 MISC for 2025 issued to Heller and "Waste Management Service Center Inc."); Ex. 2, ECF No. 16-5 (2026-2027 real estate tax for the property located at 799 Smith Lane, paid by "Heller Todd A. C O Waste Management" at an address in Chicago, Illinois); Ex. 3 (the July 20, 2013 Kean letter); Ex. 4 (the February 14, 2025 Dickman email); Ex. 5 (the March 31, 2025 Viola email); Ex. 6 (the May 16, 2025 Fabozzi letter); Ex. 7 (the Certificate of Insurance on the property, noting that the insured was WMI "and All Affiliated, Related & Subsidiary Companies"); Ex. 8, ECF No. 16-11 (the First Extension and Modification of Sublease Agreement by a Pennsylvania notary).

WMI filed a Reply on August 17, 2026, maintaining that the Court should not exercise specific personal jurisdiction or permit jurisdictional discovery. *See* ECF No. 17. WMI asserted that the April 29, 2026 Certificate of Insurance and Sedgwick letter did not support exercising jurisdiction because WMI did not purposefully direct any activity toward Pennsylvania. *See id.* at 4–5. Moreover, WMI maintained that Heller's claims "ar[o]se out of Heller's allegations that WMI intentionally or negligently misrepresented the existence of insurance coverage for Heller and/or his Property and failed to provide copies of insurance policies[,]" *id.* at 5, and "d[id] not arise out of WMI's claim for insurance proceeds for damage to its equipment or the existence or nonexistence of insurance for WMI's equipment," *id.* at 6. WMI also argued that it did not commit an intentional tort targeted at Heller in Pennsylvania. *See id.* at 7–8.

## III. LEGAL STANDARD

### A. Motion to Dismiss for Lack of Personal Jurisdiction – Review of Applicable Law

When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), this Court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. *See Pinker v. Rocher Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). However, once a defendant has raised a jurisdictional defense, the plaintiff must "prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). If an evidentiary hearing is not held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id*. A plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat. Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d. Cir 1987).

A district court has jurisdiction over a defendant to the extent provided under Pennsylvania state law. *See Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 96 (3d Cir. 2004). Pennsylvania's long arm statute authorizes personal jurisdiction over entities to the fullest extent permitted under the United States Constitution. *See* 42 Pa. Cons. Stat. Ann. § 5322(b). The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quotation marks and citations omitted). Having minimum contacts with another state provides "fair warning" to a defendant that it may be subject to suit in that state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (quotation marks and citations omitted).

## IV. ANALYSIS

Personal jurisdiction can either be in the form of general personal jurisdiction or specific personal jurisdiction. *See Bristol-Myer Squibb Co. v. Sup. Ct.*, 582 U.S. 255, 261–262 (2017). Here, the Court may exercise specific personal jurisdiction over WMI, based upon WMI's contract to insure property in Pennsylvania. Exercising specific personal jurisdiction does not offend the traditional notions of fair play and substantial justice. The Court also may exercise specific personal jurisdiction because Heller felt the "effects" of the alleged fraud in Pennsylvania. The Court will not consider whether it has general personal jurisdiction over WMI.

### A. Specific Personal Jurisdiction

Heller meets his burden to establish the Court's specific personal jurisdiction over WMI. "Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state." *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–415 n.8 (1984)). Additionally, subject to a due process analysis, a court may exercise personal jurisdiction over nonresidents who act to contract "to insure any person, property or risk located [in Pennsylvania] at the time of contracting." 42 Pa. Cons. Stat. Ann. § 5322(a)(6)(i).[1]

[1] Heller also raises jurisdictional arguments pursuant to two other sections of Section 5322(a) to support his personal jurisdiction arguments. First, 42 Pa. Cons. Stat. Ann. § 5322(a)(1)(iv), which permits exercising personal jurisdiction if the defendant transacts business in Pennsylvania by "engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth." Second, 42 Pa. Cons. Stat. Ann. § 5322(a)(4), which permits exercising personal jurisdiction if the defendant "[c]aus[es] harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth." Such sections are relevant and could provide bases for the Court to exercise personal jurisdiction over WMI, but the clearest ground upon which this Court may exercise personal jurisdiction is Section 5322(a)(6)(i).

The United States Supreme Court has articulated two tests to establish whether a court may exercise specific personal jurisdiction: (1) the traditional minimum contacts test, and (2) the effects test. *See Hasson v. FullStory, Inc.*, 114 F.4th 181, 186 (3d Cir. 2024) (citing *Burger King Corp.*, 471 U.S. at 474 and *Calder v. Jones*, 465 U.S. 783, 787 & n.6 (1984), respectively).

Courts typically assess specific jurisdiction on a claim-by-claim basis. *See Remick v. Manfredy*, 238 F.3d 248, 255–256 (3d Cir. 2001). Though, "it may not be necessary to do so" for factually overlapping claims. *Id.; see also O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318 n.3 (3d Cir. 2007). In this case, all of Heller's claims against WMI (fraud, negligent misrepresentation, negligence, and lost revenue due to negligent conduct) arise from Heller's reliance on the 2013 letter from Kean, alongside Fabozzi's representation that WMI did not have insurance on the 799 Smith Lane property. *See* Compl. ¶¶ 316–366. Although the negligence claim arises partly from WMI's responsibility for maintaining a fire suppression system, *see id.* ¶ 335, the claim also arises from WMI's responsibility for insuring the property, *see id.* ¶¶ 340–356. The Court notes that Heller's claims against WMI are factually overlapping and therefore performs a single personal jurisdiction analysis for all four causes of action against WMI. *See TorcUP, Inc. v. Aztec Bolting Servs., Inc.*, 386 F. Supp. 3d 520, 525 n.2 (E.D. Pa. 2019) ("In the instant matter, Plaintiff's three causes of action are all dependent on the same set of facts and they represent 'the total, compensable damages [directly] . . . suffered as a result of the principal plaintiff's injury'; therefore, the claims do not need to be analyzed separately.") (citing *O'Connor*, 496 F.3d at 317 n.3).

**1. Minimum Contacts Test**

The Court may exercise specific personal jurisdiction over WMI pursuant to the minimum contacts test. The traditional minimum contacts test for specific jurisdiction involves a

three-part inquiry to determine whether “the claim arises from or relates to conduct purposely directed at the forum state.” *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). First, “the defendant must have purposefully directed [its] activities at the forum[,]” such that the necessary minimum contact has been established under the Due Process Clause. *O’Connor*, 496 F.3d at 317 (quoting *Burger King Corp.*, 471 U.S. at 472). Purposeful direction satisfies the “fair warning” requirement of due process. *Burger King Corp.*, 471 U.S. at 472. Second, the plaintiff's claim must “arise out of or relate to” some of those minimum contacts, *O’Connor*, 496 F.3d at 317, showing “a strong relationship among the defendant, the forum, and the litigation.” *Hasson*, 114 F.4th at 186; *see also Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (citation omitted). “And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with [traditional notions of] fair play and substantial justice.” *O’Connor*, 496 F.3d at 317 (citing *Burger King Corp.*, 471 U.S. at 476; and *Int’l Shoe Co.*, 326 U.S. at 320).

First, WMI purposefully directed its activities toward Pennsylvania by contracting to insure the 799 Smith Lane property and the equipment thereon. To satisfy the first step of the test, the defendant need not physically enter the forum if it deliberately targets the forum. *See Douglas v. Gollihueyugulis*, No. 23-1510, 2025 WL 2181447, at *4 (M.D. Pa. May 19, 2025) (Report and Recommendation), *adopted sub nom. Douglas v. Yugulis*, No. 23-1510, 2025 WL 2181436 (M.D. Pa. June 3, 2025) (citing *O’Connor*, 496 F.3d at 317). Per this requirement, “the defendant must have ‘purposefully avail[ed] itself of the privilege of conducting activities within the forum.’” *O’Connor*, 496 F.3d at 317 (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).

Here, WMI contracted[2] to insure the property—real and personal—at 799 Smith Lane for years. *See* Exs. 3, 7. WMI also submitted a claim for equipment damage in connection with the fire at the 799 Smith Lane property, since it insured the equipment located on the property. *See* ECF No. 10-6. It appears to the Court that WMI purposely directed its conduct at Pennsylvania and "reach[ed] out beyond [its home] state [intending to] create continuing relationships and obligations with [a] citizen[ ] of [Pennsylvania]." *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1222 (3d Cir. 1992) (citing *Burger King Corp.*, 471 U.S. at 473).

Second, Heller's claims against WMI "arise out of or relate to" WMI's contacts in Pennsylvania; namely, the contracts to insure real and personal property. The "relatedness requirement" is based upon "a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *O'Connor*, 496 F.3d at 322. In other words, "[o]ut-of-state residents who 'exercise[ ] the privilege of conducting activities within a state . . . enjoy[ ] the benefits and protection' of the state's laws; in exchange, they must submit to jurisdiction over claims that arise from or relate to those activities." *Id.* (quoting *Int'l Shoe*, 326 U.S. at 319). The causal connection

---

[2] In support of exercising personal jurisdiction, Heller presents numerous Certificates of Insurance wherein WMI was the named insured, and one Certificate of Insurance over the personal property located at the 799 Smith Lane property. *See* Exs. 3, 7. Generally, a contract alone does not confer specific personal jurisdiction over a defendant. *See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not automatically establish sufficient minimum contact in the other party's home forum.") (internal quotations omitted). Courts consider several factors in determining whether a contract provides sufficient contacts to support exercising personal jurisdiction, including "whether the nonresident defendant solicited, negotiated, or executed the contract in the forum state, the terms of the contract . . ., the contemplated future consequences, and whether the nonresident defendant knew or should have known" the "individual or company" was "located in the forum state." *Dirvin v. Garrison Prop. & Cas. Ins. Co.*, No. 24-2399, 2024 WL 5159191, at *2 n.2 (E.D. Pa. Dec. 17, 2024) (citing *Ryan v. Union Mut. Fire Ins. Co.*, No. 10-4438, 2011 WL 3666492, at *3 (E.D. Pa. Aug. 15, 2011) (citing *Vertotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 151 (3d. Cir. 1996))). Here, as the Court explains, the contract is to insure property in Pennsylvania, which is a sufficient basis to exercise personal jurisdiction so long as it comports with constitutional due process. *See* 42 Pa. Cons. Stat. Ann. § 5322(a)(6)(i).

between the defendant's contacts and the alleged claims must "be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable." *O'Connor*, 496 F.3d at 323.

Here, Heller's claims are predicated upon his allegations that he reasonably relied on Kean's representations in the July 2013 letter and attachments thereto, *see* Ex. 3, relating to insurance on the property and he then cancelled the insurance he maintained on the property. *See* Compl. ¶¶ 100–101. Additionally, following the fire, Heller sought to obtain insurance information from WMI to file a claim, but WMI representatives told him that WMI did not carry insurance on the property. *See id.* ¶¶ 131–147, 304–307. Yet, Heller presents evidence that WMI contracted to insure personal property (equipment) at 799 Smith Lane at the time of the incident. *See* Ex. 7. That WMI insured equipment (personal property) in Pennsylvania in 2025 and submitted a claim for equipment damage only bolsters the argument that WMI *did* have insurance on the property in Pennsylvania. If true, WMI could have made a material misrepresentation to Heller when WMI's representatives said that WMI did not have insurance on the property. Heller's claims thus arise out of *and* relate to WMI's insuring of the equipment and the real property in Pennsylvania. *See* 42 Pa. Cons. Stat. Ann. § 5322(a)(6)(i); *see also Cornell & Co. v. Home Ins. Cos.*, No. 94-5118, 1995 WL 46618, at *3 (E.D. Pa. Feb. 6, 1995) ("According to Cornell, Williams contracted Johnson to obtain liability insurance on behalf of Cornell for risks and liabilities associated with the operation of Cornell's crane at the [] Pennsylvania job site. It follows that since Johnson was supposed to obtain insurance for 'property or risk located within th[e] Commonwealth at the time of contracting,' jurisdiction can properly be maintained so long as Johnson's right of due process is not violated."); *see also Nat'l Paintball Supply, Inc. v. Cossio*, 996 F. Supp. 459, 462 (E.D. Pa. 1998) ("[T]he giving of advice

regarding insurance, taken together with [the defendant's] co-sponsorship of the Philadelphia and Pittsburgh conferences and the sale of at least one insurance policy to a Pennsylvania resident, demonstrates that defendants have purposefully directed their activities toward Pennsylvania residents so as to establish sufficient minimum contacts to confer jurisdiction on this Court.").

Third, exercising specific personal jurisdiction over WMI would not offend the traditional notions of fair play and substantial justice. In making this determination, courts consider "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp.*, 471 U.S. at 477 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

In this case, Pennsylvania has a keen interest in adjudicating the dispute because one of its citizens, Heller, has been injured, and his injuries occurred in Pennsylvania. *See Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F. Supp. 669, 678 (E.D. Pa. 1997) ("When a Pennsylvania resident is injured in the Commonwealth, Pennsylvania has a strong interest in providing a forum for their resident and in having the responsible defendants accountable for their actions in Pennsylvania."). Additionally, the 799 Smith Lane property is located in Pennsylvania. The February 2025 fire occurred in Pennsylvania. Greenstar itself is located in Pennsylvania. Heller also has an interest in litigating in Pennsylvania since he resides in Pennsylvania. These factors heavily favor exercising specific personal jurisdiction over WMI.

Likewise, the burden on WMI is not high. WMI is incorporated in Delaware, a neighboring state of Pennsylvania, and travel to the Eastern District of Pennsylvania is not

burdensome. *See Shafik v. Curran*, No. 09-2469, 2010 WL 2510194, at *6 (M.D. Pa. June 17, 2010) (noting that when the defendant resided in Maryland, a few miles from the Pennsylvania border, "[a]ny requisite travel to this forum for litigation does not appear to work an undue hardship upon him"). WMI's defense counsel also represents Defendant Greenstar and is located in Philadelphia, so there is no additional burden on WMI. Even if the WMI officials were located in Texas, plane travel is not overly burdensome. *See Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, No. 93-3854, 1994 WL 8146, at *2 (E.D. Pa. Jan. 12, 1994) (noting that the court did "not view a few round-trip plane fares between Texas and Philadelphia to be a burden too onerous for the defendant to bear" in a motion to transfer venue). It is therefore not a major burden on WMI to litigate this case in this Court. *See World–Wide Volkswagen Corp.*, 444 U.S. at 292 ("Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute[,] the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies[.]") (citations omitted). Thus, it would not offend traditional notions of fair play and substantial justice for this Court to exercise specific personal jurisdiction over WMI.

**2. *Calder* Effects Test**

The Court could also exercise specific personal jurisdiction over WMI under the *Calder* effects test based upon Heller's fraud claim. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 261 (3d Cir. 1998). In *IMO Indus., Inc.,* the Third Circuit held that the *Calder* "effects test" requires a plaintiff to show that:

(1) The defendant committed an intentional tort;

> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 265–266 (footnote omitted). The Court need not examine the effects test propagated by *Calder* because it found that WMI's contacts in Pennsylvania satisfied the minimum contacts test. *See Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 634, 638 (E.D. Pa. 2015) (applying both the traditional minimum contacts test and, alternatively, the *Calder* test). Yet, to be comprehensive, the Court acknowledges that it could also exercise specific personal jurisdiction under the *Calder* test.

Heller has met the first two elements of the *Calder* test. He alleged an intentional tort by alleging fraud. *See McElwee Grp., LLC v. Mun. Auth. of Borough of Elverson*, 476 F. Supp. 2d 472, 476 (E.D. Pa. 2007) (acknowledging that fraud is an intentional tort in Pennsylvania). Heller also alleged that he suffered harm in the form of damages in Pennsylvania, where he resides and works. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) ("Plaintiff's residence may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum. That is, plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum.").

Heller has also met the third element of the *Calder* test. Notably, Heller alleged that WMI "expressly aimed" its allegedly fraudulent misrepresentations at Pennsylvania by contracting to insure the equipment at the 799 Smith Lane property located in Pennsylvania while telling Heller that it did not insure property in Pennsylvania (and after Heller relied on the 2013 letter stating that WMI would cover the insurance on the 799 Smith Lane property). *Imo Indus., Inc*, 155 F.3d at 266. WMI also submitted a claim to Sedgwick after the fire for personal property and equipment it owned or had an interest in located at 799 Smith Lane in Pennsylvania. *See* ECF

No. 10-6. Therefore, Heller has sufficiently alleged that WMI "knew that [Heller] would suffer the brunt of the harm caused by the tortious conduct" in Pennsylvania, and Heller has met his burden of showing that the conduct was expressly aimed at Pennsylvania. *Id.* The Court thus may exercise specific personal jurisdiction over WMI under the *Calder* effects test. [3]

## V. CONCLUSION

For the foregoing reasons, the Court denies WMI's Motion to Dismiss for lack of personal jurisdiction. The Court may exercise specific personal jurisdiction over WMI without offending due process.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_________
JOSEPH F. LEESON, JR.
United States District Judge

[3] The Court need not permit jurisdictional discovery since Heller presented sufficient evidence for the Court to determine that it may exercise specific personal jurisdiction over WMI. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (holding that courts generally should allow jurisdictional discovery unless the plaintiff's claim is "clearly frivolous").